**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RANDALL DOUGLAS BROOKS | : | |
| | : | |
| Appellant | : | No. 1546 MDA 2024 |

Appeal from the PCRA Order Entered September 17, 2024
In the Court of Common Pleas of Centre County Criminal Division at
No(s): CP-14-CR-0000141-2012

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RANDALL DOUGLAS BROOKS | : | |
| | : | |
| Appellant | : | No. 1547 MDA 2024 |

Appeal from the PCRA Order Entered September 17, 2024
In the Court of Common Pleas of Centre County Criminal Division at
No(s): CP-14-CR-0001515-2011

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RANDALL DOUGLAS BROOKS | : | |
| | : | |
| Appellant | : | No. 1548 MDA 2024 |

Appeal from the PCRA Order Entered September 17, 2024
In the Court of Common Pleas of Centre County Criminal Division at
No(s): CP-14-CR-0000568-2011

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
RANDALL D. BROOKS :
:
Appellant : No. 1549 MDA 2024

Appeal from the PCRA Order Entered September 17, 2024
In the Court of Common Pleas of Centre County Criminal Division at
No(s): CP-14-CR-0001927-2010

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
RANDALL DOUGLAS BROOKS :
:
Appellant : No. 1550 MDA 2024

Appeal from the PCRA Order Entered September 17, 2024
In the Court of Common Pleas of Centre County Criminal Division at
No(s): CP-14-CR-0002130-2010

BEFORE:   LAZARUS, P.J., BOWES, J., and STEVENS, P.J.E.[*]

DISSENTING MEMORANDUM BY BOWES, J.: **FILED: MAY 27, 2026**

As I believe that the learned majority both misapplied the structural error doctrine and ignored the prevailing legal framework in granting Appellant relief under the Post-Conviction Relief Act, I respectfully dissent.

---

[*] Former Justice specially assigned to the Superior Court.

It is beyond cavil that Stacy Parks Miller, Esquire, then District Attorney of Center County, and the Honorable Bradley P. Lunsford both violated public trust and dishonored the legal profession and their respective offices. However, as an error correcting court, our directive is not to review the ethics of those actions; that is for the respective boards of conduct, which were created to address those precise issues.[1]  We are simply tasked with determining whether Appellant established that he is entitled to a new trial pursuant to the PCRA.  For the reasons explained *infra*, I would hold that he did not.

Appellant's PCRA petition claimed that the prosecutor and trial judge violated his constitutional rights by engaging in *ex parte* communications during his 2012 criminal prosecution.  **See** PCRA Petition, 9/27/19 at 10.  In this vein, he sought substantive relief pursuant to 42 Pa.C.S. § 9543(a)(2)(i), alleging a constitutional violation that so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.[2]

_____

[1] Indeed, on December 6, 2018, the Disciplinary Board of the Supreme Court of Pennsylvania filed a report and recommendation to suspend Attorney Miller's license for one year.  It does not appear that the Judicial Conduct Board of Pennsylvania filed a case with the Court of Judicial Discipline against Judge Lunsford, who retired in in 2015.

[2] Section 9543(a)(2)(i) delineates PCRA eligibility as follows:

*(Footnote Continued Next Page)*

The PCRA court ultimately denied relief on the merits of Appellant's substantive claim. It reasoned:

> We have reviewed the lengthy transcribed record of the trial in this case. In our view, Judge Lunsford navigated the shoals between a vigorous and sometimes petulant prosecutor and an untrained *pro se* litigant **with impartiality**. We are unable to discern any evidence of an improper outside influence, let alone one that proved detrimental to the defendant. In fact, Judge Lunsford dealt with the defendant's legal missteps with considerable patience and equity. **We can find no evidence of bias in either his rulings or his charge to the jury**.

*See* PCRA Opinion, 9/16/24, at 8 (quoting PCRA Opinion, 4/28/22, at 6-7) (emphases added).

In reversing the PCRA order, the majority acknowledges that the PCRA court reviewed the record and found no evidence that the communications affected Judge Lunsford's rulings. The majority further observed that the Pennsylvania Supreme Court determined ex *parte* communications do not

_____

(a)General rule.--To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence all of the following:

. . . .

(2) That the conviction or sentence resulted from one or more of the following:

(i) A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

implicate the structural error doctrine; rather, a petitioner is still required to demonstrate harm, *i.e.*, that it is likely to prejudice a party, in order to warrant relief. ***See Commonwealth v. Bradley***, 459 A.2d 733 (Pa. 1983). Nevertheless, the majority finds a structural error in this case, not due to any nuance in the structural error doctrine, but because Judge Lunsford did not maintain adequate records of the exchanges. ***See*** Majority Memorandum at 18 ("in this instance where the trial judge failed to maintain an accurate and reviewable contemporaneous record of its *ex parte* communications, we may imply prejudice even where arguably none exists.) (cleaned up) (citation and quotations omitted).[3]

I respectfully reject this conclusion for three reasons insofar as the majority's analysis: (1) misapprehends the relevant legal authority that applies specifically to *ex parte* communications; (2) contravenes the structural-error framework that our High Court set forth in ***Commonwealth v. Taylor***, 309 A.3d 754, 780 (Pa. 2024); and (3) ignores Appellant's argument applying that legal framework to his claim that the instant exchanges were structural error, not because of some clerical shortcoming,

_____

[3] To be clear, while the majority contends "Under the instant facts, it is undisputed that [Appellant's] due process rights were violated and the *ex parte* communications between the prosecutor and trial judge constitute structural error[,]" the Commonwealth has consistently asserted that structural error does not apply. ***See e.g.*** Commonwealth's brief at 5 ("[Appellant's] attempts to shoehorn the case under a "structural error" theory are misguided.").

but due to an appearance of impropriety. *See* Appellant's brief at 32-40, 47 (arguing the alleged transgression implicates an appearance of impropriety that is so fundamentally unfair that it is tantamount to structural error, which warrants relief regardless of prejudice.). I address my concerns in succession.

*Bradley* involved a trial judge's *ex parte* response to a jury question during deliberations. Having determined that the defendant failed to prove a reasonable likelihood of prejudice due to the court's interaction with the jurors, the Supreme Court held "only those *ex parte* communications between a court and jury **which are likely to prejudice a party** will require reversal." *See Bradley*, 459 A.2d at 734 (Pa. 1983) (emphasis added). Critically, in overruling *Argo v. Goodstein*, 228 A.2d 195 (Pa.1967), its prior precedent stating that judge/jury *ex parte* interaction warranted reversal regardless of harm, the Supreme Court in *Bradley* adopted as law the rationale that then-Justice Roberts provided in his dissenting opinion addressing this issue in *Yarsunas v. Boros*, 223 A.2d 696, 698 (Pa. 1966) (Roberts, Justice (dissenting):

> The reason for prohibiting a trial judge from communicating with a jury *ex parte* is to prevent the court from unduly influencing the jury and to afford counsel an opportunity to become aware and to seek to correct any error which might occur. Where there is no showing either that the court's action may have influenced the jury or that its directions were erroneous, then the reason for the rule dissolves.

*See Bradley*, 459 A.2d at 736 (cleaned up). Hence, our Supreme Court has held that no relief is warranted in these cases absent an indication of influence.

- 6 -

Later, in **Commonwealth v. Barnyak**, 639 A.2d 40, 44 (Pa.Super. 1994), this Court interpreted an *ex parte* communication between a judge and prosecutor as requiring "evidence of influence" in order to warrant relief. The High Court subsequently endorsed both **Bradley** and **Barnyak** in **Commonwealth v. Carpenter**, 725 A.2d 154, 169 n.9 (Pa. 1999)[4], albeit in a case involving the dual conclusion that the at-issue exchange between the trial court and the prosecution was not an *ex parte* communication under the circumstances of that case **and** that the defendant did not claim a likelihood of harm. That capital appeal docket proceeding involved the Supreme Court's review of a PCRA order denying, *inter alia*, Carpenter's assertion that the trial court violated his due process by engaging in *ex parte* communications with the District Attorney about jury instructions. In denying relief, the PCRA court had concluded that the exchange was not an *ex parte* communication because it involved merely a procedural aspect of the case and the court had a similar discussion with Carpenter and his attorney the following day. **Id**. at 169. The High Court agreed, holding that the circumstances of the progressive

_____

[4] Notwithstanding our High Court's clear ratification, the majority refuses to follow the obvious precedential authority of our holding in **Commonwealth v. Barnyak**, 639 A.2d 40 (Pa.Super. 1994) because the relevant discussion was bereft of legal analysis. **See** Majority Memorandum at 17 n.16. Coincidentally, without providing a hint of legal authority for this proposition, the majority baldly posits, "Without any support, we cannot conclude that [**Barnyak**] supports the PCRA court's ruling." **Id**. The incongruity between the majority's attempt to circumvent **Barnyak** for a lack of analysis and its own failure to present legal authority to support that principle is telling.

exchanges "**coupled** with the absence by Appellant of any claim of prejudice because of the communication, convinces us that this claim is without merit." *Id*. at 169 (emphasis added).

However, as the majority highlights as the cornerstone of its legal analysis, in announcing its holding that a defendant was required to demonstrate a likelihood of harm to warrant relief for an *ex parte* communication, the **Bradley** Court acknowledged the reality that in some instances where the content of the communication is unknown, it would be difficult to establish harm. The High Court cautioned, "We do, however, remind the trial bench that failure to maintain an accurate and reviewable contemporaneous record of all instructions and communications between the court and a jury may force an implication of prejudice where arguably none exists." **Bradley**, 459 A.2d at 739.

What the majority characterizes as the **Bradley** Court's "qualification" of its decision to find *ex parte* communications subject to the harmless error analysis is simply the High Court's acknowledgement of the difficulty proving prejudice where there is no evidence regarding the substance of the communication. In that situation, the Supreme Court determined that it was reasonable to imply the substance of communication was, in fact, harmful. However, that is not what occurred in this case. Indeed, the essence of the prosecutor's missives to Judge Lunsford are undisputed: she repeatedly chastised him for what she viewed as adverse rulings. **See** Majority

Memorandum at 13 ("At the very least, we have evidence that the prosecutor complained to the trial judge, during [the] trial, about the way the judge was handling objections and the trial in general."); PCRA Opinion, 4/28/22, at 5 ("According to [the affiant], during the break Judge Lunsford stated . . . that [Attorney] Miller was "bitching to him" in text messages about the way [he] was handling some objections and handling the trial."). Hence, the evidentiary dilemma that the *Bradley* court sought to avoid in some cases involving a judge's *ex parte* communication with the jury simply is not present in the case at bar. While invoking this safety net to undermine the *Bradley* Court's unequivocal decision to require a demonstration of harm, the majority both ignores the gist of the prosecutor's messages to Judge Lunsford and fails to present any feasible reason why the lack of a contemporaneous record of those messages would have any bearing on this case, considering the acknowledged tenor of the *ex parte* communications. Thus, I find unconvincing the majority's reliance upon the *Bradley* Court's supposed qualification, in defiance of authoritative precedent concluding that a violation of due process based on an *ex parte* communication between a judge and either the jury or prosecution is not structural error. **See e.g.**, **Barnyak**, and **Carpenter.**

Having explained the shortcomings with my colleagues' position that the *ex parte* communication is tantamount to structural error, notwithstanding the **Bradley** Court's holding to the contrary, I next address Appellant's wholly

separate argument that the *ex parte* communication should be considered structural error because it implicates an appearance of impropriety, which he asserts always results in fundamental unfairness.[5] **See** Appellant's brief at 8, 37-39. Although the majority does not address the merits of Appellant's contention, it does state, in conclusory fashion, "Because it is well established that judicial bias is a violation of due process, under the specific facts of this case, we conclude that [Appellant] should be afforded PCRA relief and granted a new trial." Majority Memorandum at 13 (cleaned up) (internal citations and quotations omitted). For the reasons outlined *infra*, I reject the majority's inference that the record will sustain a finding of trial court bias.

I begin with a refresher on structural error. In **Taylor**, our Supreme Court outlined the three categories of trial court error that are prejudicial *per se*: "(1) when the constitutional right is one which does not protect against erroneous conviction, but instead protects some other interest; (2) when the effects of the violation are too hard to measure; or (3) when the violation will always result in fundamental unfairness." **Id**. at 780. The Court expounded upon each of these categories thusly:

> The first was a violation of a constitutional right that is not designed to protect the defendant from erroneous conviction but instead protects some other interest, such as, for example, the right of an individual to conduct his or her own defense, inasmuch as impairment of that right contravenes the legal principle undergirding the constitutional guarantee – namely, that a

---

[5] Indeed, Appellant does not refer to the Supreme Court's holding in **Bradley** once in his entire brief.

defendant has the fundamental right to make choices regarding the protection of his or her own liberty.

The second category concerned those situations where "the effects of the error are simply too hard to measure," for instance, where a defendant is denied the right to proceed with counsel of his or her choosing. . . . [I]n such situations, the precise effect of the violation cannot be ascertained," and because the government will, as a result, find it almost impossible to show that the error was harmless beyond a reasonable doubt, the efficiency costs of letting the government try to make the showing are unjustified.

Finally, . . . an error would be deemed structural if the error always results in fundamental unfairness. For example, if an indigent defendant is denied an attorney or if the judge fails to give a reasonable-doubt instruction, the resulting trial is always a fundamentally unfair one. It therefore would be futile for the government to try to show harmlessness.

*Id*. at 777–78 (cleaned up) (citations and internal quotation marks omitted).

Appellant's argument invokes the third category of error, one which always results in fundamental unfairness.[6]  He dedicates the majority of his argument to *In Interest of McFall*, 617 A.2d 707 (Pa.1992) and *Joseph v. Scranton Times L.P*, 987 A.2d. 633 (Pa. 2009), two cases that concern not *ex parte* communications, but judicial corruption and the outright failure to disclose an obvious bias.  I discuss these cases *seriatim*.

_____

[6] The majority's characterization of *Bradley's* "qualification" implicates the second category of harmless error outlined in *Taylor,* concerning instances where the effects of the error are too hard to measure.  Even considering that the categories may overlap in certain cases, as stated in the body of the dissent, I find unpersuasive the majority's preoccupation with the lack of a reviewable contemporaneous record in this case.

- 11 -

*McFall* involved a trial judge's failure to disclose to twenty-nine criminal defendants that she was actively working as an FBI informant while presiding over their prosecutions. *Id*. at 710. The twenty-nine defendants argued that the judge "could not have been impartial in discharging her judicial functions where she was beholden to one of the parties appearing before her." *Id*. at 712. Our High Court agreed. In affirming the order awarding new criminal proceedings, it found "[t]he circumstances under which [the judge] participated as an 'agent' of both the judiciary and the prosecution created an environment of partiality which is unacceptable." *Id*. at 713. The Court continued,

> [i]n this case the appearance of bias is obvious. [The judge's] agreement with the prosecutorial arm was a *quid pro quo* bargain. She agreed to assist the F.B.I. in their racketeering investigation, while the F.B.I. promised to make [her] cooperation known to the Pennsylvania authorities who would conduct [her] prosecution[.] Moreover, these same Pennsylvania authorities were the very authorities who appeared before [the judge] to prosecute the [twenty-nine defendants]. Consequently, this obvious conflict of interest eradicated the appearance of justice in [the judge's] courtroom.

*Id*.

Our Supreme Court relied upon *McFall* in *Joseph v. Scranton Times L.P.*, 987 A.2d 633 (Pa. 2009), which Appellant cites for the proposition that the appearance of impropriety is sufficient to warrant relief in this case. In that defamation case implicating the two jurists involved in the Luzerne County "Kids for Cash" scandal, former President Judge Michael T. Conahan and former Judge Mark A. Ciavarella, the High Court assumed plenary

jurisdiction over the case pursuant to its King's Bench authority. The issue of impropriety arose after it came to light that the judges, one of whom assigned the case to the other, were engaged in judge-shopping and co-conspirators in a scheme involving two private juvenile facilities in which they held a financial interest. In finding that judicial impropriety existed in the trial of the underlying defamation case, the High Court employed *McFall* to conclude that a new trial was warranted "to remedy the pervasive appearance of impropriety ... and to give justice, and the appearance of justice, an opportunity to prevail." *Id*. at 682. The Supreme Court summarized the evidence of impropriety thusly,

> [Scranton Times] adequately demonstrated that, in response to [its] repeatedly voiced concerns [about] judge-shopping to have Ciavarella assigned to preside over this matter, both Conahan and Ciavarella reassured [it] that the case would be assigned randomly for trial. The evidence adduced at the hearing, however, showed these reassurances to be misleading, or even plainly false, as such random assignment did not occur as a matter of course in Luzerne County at that time, and certainly did not occur in this case. Indeed, the manner in which Ciavarella was assigned to preside over this case was so unusual that the long-time Luzerne County Deputy Administrator of Civil Trials noted on the docket that Conahan and William Sharkey, the former Court Administrator for Luzerne County, who is Conahan's cousin (Sharkey has since resigned in the wake of federal corruption charges), had hand-assigned the case. The Deputy Administrator stated that she was motivated to make this unusual notation because she wanted to afford herself some protection.

*Id*.

Thereafter, the Hight Court concluded,

> It bears repeating: a jurist is either fair or unfair; there are no acceptable gradations. This case was assigned by Conahan,

through Sharkey, to Ciavarella for trial. After rendering a series of evidentiary decisions against [the defendants], Ciavarella returned a bench trial verdict in favor of [the plaintiffs] in the amount of $3.5 million. The inherently troubling nature of Conahan's and Ciavarella's compromised positions as jurists is enhanced, in this case, given that the subject matter of this defamation lawsuit concerned newspaper articles reporting on the undisputed fact of a federal criminal investigation into [the plaintiff's] alleged ties to organized crime activities . . . [.]

*Id*. at 682-83.

Plainly, both **McFall** and **Scranton Times** stand for the proposition that a demonstration of obvious judicial bias obviates the need to establish actual prejudice. In those cases, the mere appearance of impropriety is sufficient because the jurists' bias is palpable. However, notwithstanding Appellant's assertions, the record in the case at bar does not bear out obvious judicial bias. Indeed, as summarized, *infra*, the record supports the PCRA court's contrary finding that Judge Lunsford remained impartial.

Appellant failed to allege any facts, let alone advance any evidence, tending to show bias, prejudice or unfairness on the part of the trial court judge. In short, in contrast to the facts underlying **Taylor**, **McFall**, and **Scranton Times**, the circumstances herein did not raise an appearance of partiality that would have warranted a new proceeding. First, unlike the basis for Appellant's claim for relief in the case *sub judice*, none of those cases implicated an *ex parte* communication. For example, in **Taylor**, the High Court examined "a juvenile court violat[ion of] a juvenile's Fifth Amendment right by . . . conditioning its ultimate finding of the juvenile's amenability to

treatment. . . upon a requirement that the juvenile admit guilt for the offenses he is alleged to have committed[.] " *Taylor*, 309 A.3d at 783. In finding a fundamental unfairness in that situation, the Court reasoned, "By imposing such a manifestly improper requirement, a juvenile court has, in effect, created an irrebuttable presumption that, if the juvenile refuses to incriminate himself, he is not amenable to treatment, supervision, and rehabilitation, no matter what the other competent evidence of record demonstrates." *Id*. It concluded, "[t]his type of constitutional violation therefore inevitably disrupts the framework of the certification process because of its distortive effect on the entirety of the juvenile court's decision-making process." *Id*. As our High Court gathered in *Carpenter*, by conditioning relief, at least in part, upon evidence of influence, there is no such distortive effect inherent to *ex parte* communications. Additionally, no indication can be drawn from the *Taylor* Court's holding or rationale that it sought to overrule this line of cases by applying the doctrine of structural error to these violations and alleviating the need to establish actual prejudice.

Moreover, as it relates to the remaining cases Appellant cites in support of applying structural error, Judge Lunsford's receipt of Attorney Miller's *ex parte* communications does not implicate obvious bias and corruption based upon a judge's *quid-pro-quo* cooperation with law enforcement in the hopes of easing her own criminal culpability, or a pair of dishonest jurists channeling cases to one another for their own pecuniary gain. While those situations

involve clear conflicts of interest that created an environment of patent partiality, in no way is the bias inherent in those matters akin to Judge Lunsford's failure to disclose his receipt of text messages from Attorney Miller complaining about unfavorable rulings. Indeed, as the Commonwealth highlights, the fact that "the rulings were cutting against . . . [A]ttorney [Miller] demonstrates the trial judge's impartiality had not been compromised, despite the *ex parte* communications." Commonwealth's brief at 17-18.

In sum, Appellant's position is founded upon cases that address the appearance of impropriety stemming from judicial bias and corruption. However, the case at bar implicates neither of those transgressions. Rather, this matter concerns *ex parte* communications, and the dispositive legal authority addressing *ex parte* communications precludes relief absent evidence of influence, *i.e.* prejudice. **See e.g.**, **Bradley**, **Barnyak**, and **Carpenter.**

I hasten to agree with the learned majority that Judge Lunsford's failure to disclose to Appellant Attorney Miller's *ex parte* communications is both abhorrent and violative of Appellant's right to due process. However, neither of those truths constitutes structural errors. In addition, unlike the facts underlying the cases that Appellant invokes, the violation of due process did not undermine the entirety of the court's decision-making process and there simply is no evidence that the communications influenced Judge Lunsford in any manner. Stated plainly, insofar as Appellant failed to present evidence of

judicial influence in this case, he cannot satisfy the PCRA's requirement to demonstrate that the alleged violation "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S § 9543(a)(2)(1). Accordingly, in contrast to my esteemed colleagues, I would conclude that the PCRA court did not err in denying Appellant's claim for relief on that basis. Therefore, I respectfully dissent.